by the Texas Supreme Court for determining whether a fee contract is reasonable. The arbitrators had one initial problem that I don't see is necessarily pursued anymore on appeal, which is whether the law firm had completely disclosed how these fees were not just a little high or whatever the word was on the high end, but well beyond what had ever been charged before. Is that still in this case as an argument on appeal? That is not in this case. Okay. And then beyond that, the high fees the Court determined, high hourly rate the Court, the arbitrators determined were sufficiently supported, but I don't see that they wrestled in the way that the district judge did with the high hourly rate joined with a low end, but nonetheless a contingency fee. And that to me is perhaps the best way to get the district judge's heartburn on this, on the unconscionability. Is that strictly an error at most of law and fact that cannot be reviewed by the district judge? Well, I would say it's an error made by the district judge because the arbitrators did review that. In fact, they determined that the entire . . . Well, in the first place, they talk about it at the very end of paragraph 11, which would be in record 3354, where they say the arbitrators further find that both fee agreements are fair, reasonable, and equitable, and that the particular facts under the particular facts and circumstances of this case, a competent lawyer would form a are reasonable, and that's after they have already talked about the entirety of the fee. So the fee agreement was misunderstood by the district court, and I don't want this court . . . I don't even believe you ought to have to look at it because of what the arbitrators did, but on pages 57 and 58 of the fee contract, it makes very clear that this contingency percentage, and really both parts are contingent on a recovery, but I'll get to that in a minute. The 15 percent is due and payable only on a particular kind of result, and that would be segregating this trust for the benefit of Mr. Hill in such a way as he had reasonable expectations of getting distributions. This trust had never made a distribution in its 70-year history. It was formed in 1935, and had never made a distribution. Mr. Hill came into Campbell Harrison's offices without any ability to pay hourly fees or anything else because he had no job, and the only source of income he had ever had was from his family, which had been cut off. If he had no ability to pay hourly fees, why wouldn't you have a high contingency and a low hourly rate instead of the opposite? This is something that he suggested that he wanted. He did not want to give a high percentage. And it's undisputed he had outside counsel looking at it? That is undisputed. His testimony in the record is he had a lawyer look at it before he signed the contract, and then when it came up that he had, without Campbell Harrison's knowledge, previously assigned his interest to a company to get some financing, all that had to be done resulting in the ratification agreement, which the arbitrators mentioned. The ratification agreement recites all these facts, and he signs it freely and with the counsel of Baker Hostetler, one of the biggest law firms in the country. Any recovery, no recovery, absent success. So that means you're within Hoover and Mandelby Thompson? Yes. And, Your Honor, it goes even further. We could have won, my clients could have won the disclaimer issue, but had the trust not been separated, and had Mr. Hill III not been able to appoint his own trustee, he still would have not gotten any distributions, and the 15 percent would not have been triggered just on simply winning the case and establishing Mr. Hill Jr.'s confidence when he signed the disclaimer. And likewise, the hourly rates now, we refer to them as high. They're on the high end of what my clients charge, but these are much lower than the Houston and Dallas markets, lower than Mr. Hill had paid other lawyers, which is all in the record. The record, by the way, is very limited. The Hills filed a very limited record in the district court. That would be particularly problematic if we were reassessing the good cause finding? Yes. Because, to be honest, when I read through the arbitral award, that's where I stumbled. The panel seems to have said, well, good cause to discharge is always met by malpractice. It sort of might be met by a justifiable loss of confidence. And then it says, and there's the ROCA standard. But then I never really saw any application of the ROCA standard. Well, the ROCA standard . . . Well, the good cause Villanoa is not an issue on appeal, is it? Right. It's not an issue. So, I mean, I could go into that and show you where they found that there was no malpractice and no breach of fiduciary duty. Their arbitrator specifically did find those things. Yeah. But the hourly rate, okay, the hourly rate was not the normal kind of hourly rate that you must pay every month. The contract says, and pardon me for reading it, it's at record page 58, the monthly statements are due in good faith and as soon as financially practicable. Financially practicable and the undisputed evidence is he told, he, Mr. Hill, told my clients that he could not pay these fees on a monthly basis because he had no source of income. Now, is that part of the limited record that's before us? That is, Your Honor. It's in the few pages that they filed. Well, to give you the complete picture, we filed a motion to confirm and put just the award and the contracts in. When they filed their motion to vacate, we filed a response and we put more in the record. So, both of us put stuff in the record. But if you're wondering why we didn't put the whole record in, I can answer that for you. We did not believe it was our burden. Under Texas law, that's a problem for the person challenging the award. And secondly, we did not want to indicate to the district judge that we thought he had some obligation to review the whole record. His obligation under this court's precedence, under CVN, under the Texas precedence that we've cited, is to enforce the arbitration award unless there is a statutory reason not to or this narrow public policy that the court landed on, which this court held in Albemarle, is so limited that this . . . Let's assume that under the Texas Arbitration Act, which we're proceeding under on a federal basis, as I understand it, is diversity. Let's assume that the judge could determine whether the award was unconscionable as against public policy. Just assume he had that power. How did he err in applying that standard? He erred in applying it because he had to go back and re-review and re-characterize the facts that the arbitrators had already found. He said the hourly fee was guaranteed. He said the percentage fee was guaranteed on any success. That's not what the arbitrators found, and that's not what the contract says. If he did say that, that would have difficulty with Hoover. Yes. If these arbitrators had said, you know what, this is unconscionable, but we're going to enforce it anyway, then I would understand the district court's ruling. But that's not what they said. In fact, if you look at CVN, which was cited by the district court, the court there was dealing with whether arbitrators could decide whether a mechanics lien was enforceable against a homestead. I know that lawyers' relationships with their clients are sacrosanct, but so are homesteads in Texas and probably in other states. There was a big argument in the Texas Supreme Court among the justices, as you can see in the opinion, about whether arbitrators ought to even be able to deal with this issue topside or bottom. And the Supreme Court said the arbitrators can determine whether the material means and mechanics liens met the standards for enforcement against a homestead, even though the homestead right is constitutionally protected. The court went on to say, now, had they said this doesn't meet the standard, but we're going to enforce it anyway, then you'd have a violation of public policy. And the same thing is found in the Humatech case, which we cited to you out of one of the Houston courts of appeals. And there the issue was whether the arbitrators could make a ruling about whether a fee was a finder's fee or a kickback. And the arbitrator said, I didn't believe the witness. It's all in the opinion. I didn't believe the witness said this was a kickback. This was a finder's fee and enforceable. And the court of appeals said you can't throw out the arbitrator's finding. If he had found it's a kickback and enforced it, that would have been one thing. But he found on the facts that it was not. It was a finder's fee. Same here. The arbitrators in three different parts of their opinion found that Mr. Hill was not credible. He was not credible on the issue of whether he was under duress. He was not credible on the issue that somebody told him good cause meant any good reason. And he was not credible on yet another issue. And I forget it at the moment. But the fact of the matter is, he knew, Mr. Hill knew what this contract meant. And I would like to point your honors to one page in the record that talks about this percentage fee. And it's on page 3411 of the record. And this is in the bottom right-hand corner. It's one of the transcripts that's multi pages on one page. And I was asking Mr. Hill about this 15%. And he had been arguing with me about he didn't know when the 15% was due. But finally he said, and I asked him, you understood when you signed this contract that under certain circumstances what was established for your benefit would be due. He said, in certain circumstances, yes. And I said, one of those circumstances would be that you had a reasonable expectation of receiving distributions from the trust. Right? And he said, that was one we had discussed. Yes. And I said, and that's in the contract. And he agreed with me. So at the time he knew that this 15% was not going to be automatic just by approving the disclaimer. We had to get a trust segregated and him able to appoint his own trustee, which has now, of course, happened by virtue of the final judgment. The chronology, it's undisputed that your clients are fired shortly before the mediation in November of 2009? That's correct. But was it not until May of 2010 that the global settlement agreement is, that's correct? So that's a span of time, but your position still is that the terms of the settlement were finalized just weeks after you were fired? Well, there's two points. The main legal point is under Mandel and Wright, if you fire an attorney on a contingent fee contract in Texas, I know the Louisiana law and other states are different, but if you do this in Texas and you don't have good cause, even if he's only worked a week, you're still owing the contingent fee. And the reason for that is the honoring of contingent fees is not just important to lawyers, it's important to clients who can't otherwise get lawyers. Because that's Texas law. That's Texas law. Yeah. Other states are less sympathetic. Exactly. Exactly. But to answer your point, we put in an exhibit in the record, and if I don't find it right here, I'll give you the number when I come back up, but it's a comparison between the offer that was made by Mr. Washburn, who is one of Mr. Hill's brothers-in-law, on behalf of the family in November or maybe December of 2008, and it lines exactly up with what they ultimately got in May. That extra six months of litigation didn't do them anything. But again, yes, we earned it and we proved that to the arbitrators, but the fact is we were due the contingent fee because we were discharged without cause. That's right. One aspect of the award the district judge set aside was this 5% post-judgment interest. You don't specifically, as I understand it and looked through your brief, you don't think to concede that instead of the 5% post-judgment interest, it ought to be whatever the statute provides at the more limited rate? Well, I'd like to give a little more than a yes or no. I believe that if this court renders judgment in our favor or returns it, which we would ask for a rendition, but if we return it to the district judge for a new judgment, the pre-judgment interest would run up to that time. But afterwards, I have seen the case law. I understand that we did not specifically in our agreement give the arbitrators the right to determine post-judgment interest different from the federal rate, although they did. So I think we're going to have a chance to deal with that later, so I don't believe the court needs to deal with that in this particular appeal. I see my time has expired. Thank you. We'll see you again in a few minutes. Good morning, judges. May it please the court, counsel Michael Molliff for Albert G. Hill III and Aaron Hill. Your Honor, is the I see you have divided your time. Are you going to try to do it in some sort of subject matter division? Yes, Your Honor. Yes, Your Honor. All right. I'm going to discuss the issues with regards to unconscionability of the contract, and some of the other issues of the court. Your Honor, the appellants What are the other issues he's going to discuss? I'm sorry, Your Honor? What are the other issues he's going to discuss? He's going to get into a little bit of the arbitration, the issues regarding arbitration, and a few other issues regarding the unconscionability of the contract, as we argued in our brief before the court as well. I thought you were going to talk about unconscionability. Well, I'm going to talk about some of the aspects of the unconscionability, and then Mr. Brott's going to sort of clean up the argument. That's not real helpful, but it's your argument. Thank you, Judge. Your Honor, the appellants in their brief cite different circuits, different states. When the issue pertains to Texas law, as this particular fee agreement does, this court has ruled that the Supreme Court of Texas precedence applies. In fact, in Packard v. OCA, That's a diversity case, isn't it? I'm sorry, Your Honor? You're here on diversity jurisdiction. Isn't that the basis for being in federal court, diversity jurisdiction? No, Your Honor. This case originally, years ago, was filed in state court by my client, and the defendants in that case removed it to federal court at that point. Then we say . . . What's the jurisdiction in district court for the district court that acted on this arbitration award? What's the jurisdiction? We say the jurisdiction in district court . . . Well, let me make sure I'm answering your question correctly. The case was removed by the defendants, not the I thought it was based on a federal question. I'm trying to recall going back, because the defendants in the case were some of the trust defendants who were all Texas residents, I believe. My clients at the time were also Texas residents as well. We can determine what the basis was if you're not quite ready to address that, but Texas law applies to this arbitration interpretation, is what you're saying? Yes, Your Honor, because the arbitration agreement, Your Honor, specifically states in there the Texas General Arbitration Act applies, and the contract that is at issue here, the attorney-client fee agreement, states that Texas law applies. And this court, Your Honor, in Packard, stated on issues of Texas law, Texas Supreme Court case is binding. Now, Texas Supreme Court, Your Honor, and CBN Group versus Delgado, which is cited in my brief, doesn't differentiate between arbitration cases and regular standard litigation cases. And I'm citing Pennsite 238, and a legal contract, which what we say this contract was illegal, is unenforceable by litigation, should not gain legitimacy through arbitration. And that's, again, Pennsite 238 and CBN versus Delgado. So, all the argument by the appellants that because this is an arbitration case, or was first determined by an arbitrator, somehow makes a difference, we disagree with that contention. We don't believe that the way that this contract was written up and was signed by our client, we don't believe that this contract is enforceable, regardless of who the trier of fact is. And we don't believe that this court erred in any way in reviewing the conscionability of the contract. Appellants discuss the issue . . . The core problem that I see is you have a very well-resourced, frequent litigator, and it's undisputed he consulted with outside counsel. And in that context, he signed a contract that deferred the fee agreement arrangement to arbitration. So, at that point, you do run into an exceedingly limited judicial review of the arbitration award. And it seems to me the fee agreement, this is my biggest concern, the arrangement structured here is exactly the one the Texas courts have allowed in Mandel and Hoover. Well, Your Honor, and thank you for bringing that up, the exceedingly limited review, my understanding is that's under the Federal Arbitration Act. Okay? Texas courts give deferential review to the arbitration award, but not exceedingly . . . Well, the Texas Arbitration Act specifies what the court reviewing an arbitration can do, doesn't it? Well, yes, Your Honor, but . . . It's got about four or five clauses similar, I suppose, to the Federal Arbitration Act. And then, as I understand it, under Texas law, it can also review it for public policy considerations, for lack of a better term. Yes, sir. But it's not unlimited as to what it can do in reviewing an arbitration award. No, Your Honor, it's not unlimited, but the review still is an issue of law in this case. But you're not bringing to us a statutory basis to excuse, right? You're not bringing up partiality and neutrality. You're not bringing up the Section 3A claims you might have had below. Your only claim now is that it's unconscionable, the common law argument. Is that correct? That's the only argument before us, is unconscionability. I believe I also cited the Texas Business and Commerce Code as well, Your Honor, in my brief. But are you asserting statutory exemptions? Are you arguing a 2A or a 3A exception? Well, I'm arguing, Your Honor, on the unconscionability issue, the same argument that the district court stated, that this agreement is simply void. It's against public policy. It was void at exception. Okay. And that gets me to why isn't this exactly the type of agreement Texas contemplated in those two cases, with the Hoover limitation not implicated because there was going to be no award to the attorneys without success? Well, Your Honor, the problem with the assumption that there was going to be no award to the attorneys, first off, some of the things that were stated by opposing counsel weren't before the district court when it made its determination with regards to how much money the Hills had, for instance. This contract provided a clause that stated there's a quarter of a million dollar retainer that's immediately replenishable once the retainer runs out. The mere fact that CHD may have not been able to immediately collect on any amounts due, I believe that's a separate issue as to whether the client actually owes the money. We don't believe at all, and I don't think the facts support it, and I don't believe the case law supports it, that the hourly rate, the hourly fee agreement is contingent in any shape or form. Again, I mean, the Hills were going to owe the hourly fee agreement regardless of what the outcome of the arbitration was going to be, regardless of the outcome of the litigation was going to be. They owe that money. In fact, the district court awarded them the hourly fee agreement. Now, we believe, based on the case law that I cited, Your Honors, that that's still because they caused the Hill to enter into this contract. I mean, you know, and in Mandel, Your Honors, that particular case, the attorney had the client enter into a standard fee agreement. How did they cause him to enter into the contract if you agree that he had a separate counsel look at it? How can you say they caused him to enter into this? Your Honors, I did not find a case that stated that merely because a client is represented by counsel when he enters into a fee agreement, that excuses the attorney who is asking the client to sign a fee agreement from not abiding by Texas public policy. Right, but you said they caused him to sign it. Well, Your Honor, when I say you caused someone to sign it, if you ask someone to sign it, I'm not saying they put a gun to his head and told him to sign it. I'm not saying that they put him under extreme duress by some action that they did. The client signed the contract, and in Texas, as the panel knows, an attorney owes a client fiduciary duty to not engage in self-dealing and to always have the client's interest above his own interest. The panel here made an explicit finding that there was no breach of fiduciary duty. There was no malpractice. That's a factual finding this arbitration panel made. Well, and again, Your Honor, we disagree with the arbitration panel's finding because I don't believe the arbitration panel considered that the original contract that started this fight was voided as against public policy. This contract, Your Honor, allows a distribution of fees to CHD, and I don't believe that the arbitration panel considered that the original contract that started this fight was voided as against public policy. I know you're running into this. You get 20 minutes. Whether you take 10 and he takes 10, or you take 13 and he takes 7, you're eating into his time. I don't care what you do. Yes, sir. Yes, sir. He's given us a no-moss signal from the table. I guess he's happy for you to keep talking. Yes, sir. Why don't you start the 10-minute clock, and we'll see how far he gets, if co-counsel takes any time or not. All right. Thank you, sir. And again, this contract not only required the hourly fee agreement, which was awarded to the appellants, it provided for this contingency fee agreement unless they were fired for cause. Termination for cause is not at issue here. You didn't raise that. In your cross-appeal, you don't challenge the finding that they were not terminated for cause. Well, Your Honor, I understand that, but what I'm saying is that the contract, we believe that they were terminated for cause, but again, that was not before the district court. I concede that. But after being terminated for cause, it also has a provision in there that allows fees to be paid in perpetuity. And there are two issues, Your Honor, whenever you look at . . . I want to ask you about your analogy to a contract for murder at page 6566 of your brief, where you say the arbitrators in this case might as well have awarded fees arising out of a contract for murder by awarding outrageous fees arising out of a void fee agreement. The arbitrators clearly exceeded their powers. And then you make the analogy to a contract for murder, and you complete it at 66 by saying . . . you're making this analogy to show that the arbitrators have no more power to render an award arising from the illegal and unconscionable fee agreements than they would rendering an arbitrary contract illegal. The judge found it unconscionable, contrary to what the arbitrators found, but how is a contract illegal? Your Honor, I believe an unconscionable fee agreement between an attorney and a client . . . because the appellants discuss issues regarding this being an arm's length transaction. But this court in 1982 had ruled that attorney-client fee agreements are not arm's length transactions in Nolan. The appellants attempt to discuss how they try to treat this attorney-client fee agreement like a normal commercial contract. It's not a normal commercial contract. It's an attorney-client fee agreement. So I don't see the difference when you do the final analysis between an illegal contract and a void contract. A void contract and an illegal contract are void from their inception. It never happened. Just like Your Honor and Packard, this court did not allow OCA to recover on that illegal or void dental agreement. So I don't see why CHD and CNDW should be able to recover on this contract that when you look at the contract itself, you have two issues. How the contract was originally formed. There's been a lot of discussion about how it was originally formed. The analysis for unconscionability, Your Honors, also deals with what the result of the contract was. There's a two-pronged analysis to determine unconscionability in contracts. And the resulting contract, Your Honor, the result of the contract, allowed a $28 million judgment for the appellants plus the high hourly fee agreement for about one year's worth of work. Does the record reflect whether he had a similar fee arrangement with the firm prior, the Bickle firm? It doesn't reflect that, Your Honor. Does the record reflect whether he had a similar fee arrangement with the successor law firm? It doesn't reflect that, Your Honor. There's statements in the brief, at least, that would say that he did. Is that not in the record? I don't know which one of you said in the brief that there were similar contracts entered prior to this one. Your Honor, the magistrate judge had found, she made a finding that my client, Mr. Hill III, is a sophisticated purchaser of legal services, I believe were her words. That particular contract that she was referring to did not involve a high hourly fee arrangement. Did it have a mixed fee and contingency? Did it not? Hourly rate and contingency? I believe that one, Your Honor, and again, I believe that particular contract only had a contingency agreement. I don't believe it had a high hourly plus a high contingency. What's the unconscionability here? Let's say they just negotiated a 30% contingency fee. No hourly rate. Would you be saying that's unconscionable? Well, I would say that the part of it where it awards them 30% of any proceeds from the trust in perpetuity, I believe, could already be unconscionable. Now, simply a 30% contingency fee agreement, that's about standard. The standard is about 40, 30 to 40%. That plus... So here they cut more than half. The contingency is less than half what you say is standard. Right. And it's unconscionable, Your Honor. Thank you for bringing that up. The hourly rate, Your Honor, in of itself, whether that's unconscionable or not, as far as what the hourly rate is, we're not challenging that. There wasn't enough evidence before the case. What's your best case that this is unconscionable? Your Honor, the best case is what the result of the contract... Best case. Case, not descriptive from you. I mean your best case. Precedent. Precedent, thank you. The citation with it. Oh, well, Your Honor, Hoover Slovichek, you know, payment of a contingency fee, even with termination, violates public policy. You know, if an attorney who signs a contingency fee where the contingency fee itself is okay, it's not unconscionable, if he's terminated before the case is over, he's entitled to something, but he's not entitled to the full contingency award. That's just not what Mandel v. Thompson says. Other states say that, but that's not Texas law. Well, Your Honor, but I believe in Penn State 562 and Hoover... Right, but Hoover was guaranteed success or not. Right. Okay. I guess that's your argument that that's what this case is, right? I guess that's your... successful or not. Therefore, it's a Hoover case and it's unconscionable. Well, they were going to get the hourly fee for sure. I mean, they got that. I mean, there's nothing in... Hourly fee for value of services already rendered, but that's under any law, they're going to get that. Plus a contingency fee agreement on top of a high hourly fee. That was a district court's contention. That results in a contract or that results in something that is wholly unconscionable. Well, I think the figure that is used is if you combine the amount of fees owed on the hourly rate and the 15%, it comes out to a percentage of the total recovery of 16.9%. So we'll just say 17%. Right. Why do you keep saying, no, that's incorrect, that they're going to be getting money in perpetuity when the district judge and the arbitrators, I believe, found that their recovery is 28 million or whatever, 16.9%? The contract provided that they get to recover in perpetuity. Well, but the arbitrators awarded a fixed amount, didn't it? Right. And the district judge took that fixed amount, lopped out the 15% contingency and only gave them whatever their hourly rate, let's say $4 million. And $4 million is certainly a large sum. I don't mean to use the word only in the sense of it's de minimis. But I don't understand your argument that this is unconscionable because they're going to be receiving fees in perpetuity. And I want to hear on rebuttal about that claim. So why do you say it's perpetuity when we've got a fixed amount here and that's the award? Well, Your Honor, the original contract itself says that they were going to receive something in perpetuity. Now, that's not what they were awarded. But the essence of an unconscionable fee agreement goes to what the attorney had the client sign. I mean, that's the essence of it. And we don't believe that the case law supports the appellant's right to benefit from this contract. I mean, I even set out that even if you . . . The arbitrators didn't find the contract illegal. The district judge did not find the contract illegal. He just said their fee amount was too great. But he certainly was awarding them fees. I don't know how the district judge, once an arbitrator refuses to say the contract is illegal, the district judge has a limited basis on which he could find otherwise under the Texas Arbitration Act. And the district judge, Your Honor, did exactly that. He found the fee agreement to be unconscionable against void against public policy. He just found certain aspects of it. Well, he carved out the contingency fee agreement, correct. But, you know, we're asking the court to just go a step further and consider the contract as a whole as to whether the contract as a whole is unconscionable and whether the appellants have a right to recover on the contract itself. All right, counsel. Thank you. Thank you, Judge. If that pleases the court, I'd like to ask a question about in perpetuity. The contract did not provide for fees in perpetuity. Page 57 of the record is the description of the percentage. And the way this works is if money was distributed as a result of a resolution which is defined in those distributions that had already been had are subject to the 15 percent. The next paragraph is about assets and a trust that from which he has a reasonable expectation of distributions. He had talked about a financial divorce from his family. He wanted his own separate trust. Like I said on opening, if all we had done was establish a disclaimer, he still wouldn't have gotten any money because the trustees were friends of his dad that didn't like him. And that's the way it was. We have evidence in the record that Al had been inherited by his father. This was a family feud among the rich and famous. So are you agreeing that all your clients are seeking is the award by the arbitrators? There's no future claim to any funds? That is absolutely correct, Your Honor. We are done. Counsel, let me make sure on another aspect of that. District Court did what it did and remanded for recalculation of your fee in light of the change in circumstances. It remains to be seen what we do with this case. Map out for us what you think we should do, including that ruling as to your fee. Well, I believe this . . . What order do you think this Court should enter if we end up agreeing with you? I believe you should render judgment enforcing the arbitration award. And the reason I want you to render judgment is perhaps to cut off yet another appeal by our opponents who are frequent flyers, as Your Honor said, in this Court. So we would like a remand, a rendition of judgment confirming the arbitration award. I recognize this Court has said in the past that we should not have a remand. But under the TAA, there's no restriction on . . . But if we remand, it would just be to order the District Court to reinstate the arbitration is what you would have us do. True. Were we to agree with your side in this case? Yes. Yes. And determine the amount of pre-judgment interest anew and then to impose the federal rate for post-judgment interest? Yes, Your Honor. A couple of things. I always . . . My hair on the back of my neck goes up when people say I didn't put something in the record. It said there was nothing in the record about whether the Hills had money. At page 3415 of the record, it's again Mr. Hill's testimony. At the bottom right-hand corner again, it's page 824 of the arbitration transcript. I asked him, when you saw the rate schedule on CHD's contract that struck you as being lower than what you were paying other lawyers at that time? Yes. Did you tell Campbell, Harrison, and Dagley whether you were able to pay the hourly fees on a monthly basis? That I wasn't. Yes. What did you tell them about when you could pay? As I was able, when I was able. And that's the concept that was put in this contract. If you look at page 58 of the record where it's talking about the hourly fees after the part that we've already focused on, it says no later than . . . you'll pay these fees no later than when you begin to receive distributions as a result of a resolution. What was the record site you gave us? Just now? No, not the record excerpts. The 30 . . . 3415. 3415. And about the Bicklin Brewer contract, which was before us, it was a hybrid. There is evidence in the record of that. It's at 3428. Also from the deposition? This is from the, well, this is from the arbitration hearing. Hearing. Hearing, yes. And this is the testimony of Mr. Harrison talking about the Bicklin Brewer agreement because it had been provided to them as a combination of hourly and percentage fee. What of the argument that just having another lawyer look at the contract, it's not providing protection? Do you have any case law that gives that heightened protection from this sort of argument? Well, the Tanox case deals with it in a certain way. There the claim was that Aiken Gump was a fiduciary before they signed the contract and that therefore fiduciary duties applied. Now, our arbitration panel said well, even if that's true, there's no breach of fiduciary duty. But in Tanox, the court noted that the company, Tanox, had been soliciting advice from Fulbright and Jaworski to represent them as well. So it's not exactly like they had looked over the same time. The New York case, of course, nobody likes us to cite that, but that last one we cited, the lady there had advice from an accountant and the court took that into effect. But the main thing is that . . . When you say last, sorry, what's that case? Well, it's in our reply brief and I've forgotten the name of it, but it came out after our opening brief had been filed. I know my time is out. Can I give you one more record cite? Oh, record cites are accepted. At 1795, the Hills told the arbitrators that this contract was void as against public policy and therefore the claimants, us, should be relegated to quantum merit. The voidness was submitted to the panel. A different remedy was asked from them than has been asked here. We asked for this court to render or remand full enforcement of the arbitration award. All right, counsel. Thank you. Thank you both sides for explaining this to us.